UNITED STATES of America,

v.

Wayne CHIN, Defendant.

No. CR–92–407 (DRH).

United States District Court,
E.D. New York.

Dec. 22, 1995.

**890**

Zachary W. Carter, United States Attorney, Eastern District of New York by Leonard Lato, Asst. U.S. Atty., Garden City, New York, for the Government.

Wayne Chin, New York City, pro se.

Gary Schoer (prior counsel), Syosset, New York, Emanuel A. Moore (prior counsel), Hollis, New York, for defendant.

HURLEY, District Judge.

### INTRODUCTION

On January 25, 1995, a jury returned a verdict convicting Wayne Chin of being a felon in possession of both a firearm (Count One) and ammunition (Count Two), and acquitting him of the other two charges in the indictment, to wit, being an illegal alien in possession of a firearm (Count Three) and in possession of ammunition (Count Four).

Presently pending before the Court is defendant's post-trial motion, made pursuant to Rules 29 and 33 of the Federal Rules of Criminal Procedure, for entry of a judgment of acquittal, or for a new trial.[1]

The defendant's application is multifaceted, not only with respect to the grounds urged in support of the requested relief, but also with respect to the sources of the various arguments raised. The first such motion received by the Court was made by Gary Schoer, Esq., the then attorney for the defendant. A few days thereafter, a second set of motion papers arrived, these having been authored by defendant, proceeding *pro se*. The defendant supplemented the grounds advanced by Mr. Schoer by adding two more arguments, *viz.* ineffective assistance of counsel and prosecutorial misconduct.

Given the "ineffective assistance of counsel" claim, coupled with the fact that defendant asked that Mr. Schoer's application be entertained,[2] the Court accepted both Mr. Schoer's and defendant's *pro se* submissions.

---

1.  The object of a Rule 29(c) motion is a judgment of acquittal based on the insufficiency of the trial evidence to sustain the conviction; in contrast, the relief sought pursuant to Rule 33 is a new trial based on "the interests of justice." *See United States v. Clemons,* 658 F.Supp. 1116, 1118–19 (W.D.Pa.1987), *aff'd,* 843 F.2d 741 (3d Cir.), *cert. denied,* 488 U.S. 835, 109 S.Ct. 97, 102 L.Ed.2d 73 (1988).

2.  (*See* Def.'s *Pro Se* Feb. 26, 1995 Mot./ Mem.Supp. at 1.)

Thereafter, another attorney, *viz.* Emanuel A. Moore, Esq., was appointed to serve in lieu of Mr. Schoer.

The government filed its Memorandum in Opposition to defendant's motion on March 28, 1995. Mr. Moore submitted a Reply Memorandum on May 15, 1995. And finally, the Court received a copy of a letter, dated May 17, 1995, from defendant to Mr. Moore, in which a request was made that the Reply Memorandum of May 15th be withdrawn by counsel on the ground that it represented "a love letter to the government." No such request was ever made directly to the Court, either by Mr. Moore, or by defendant. Accordingly, the Reply Memorandum has been reviewed by the Court, and considered to the extent it does not raise arguments contrary to those raised by defendant in his *pro se* submissions.[3]

The arguments raised on behalf of defendant, via the various submissions, fall into two categories. Those in the first category seek a new trial, pursuant to Rule 33, upon the following grounds:

1. The guilty verdicts are the result of perjurious testimony by government witnesses;

2. The Court compromised defendant's constitutional rights by ruling that he could not call Police Officer Killigrew to the stand for the purpose of having him invoke his Fifth Amendment privilege in front of the jury;

3. Defendant was denied a fair trial by the failure of the New York City Police Department to timely respond to his subpoena;

4. Defendant did not receive a fair trial due to prosecutorial misconduct; and

5. Defendant did not receive a fair trial due to ineffective assistance of counsel.

The sixth and seventh arguments advanced are premised on Rule 29(c), and urge that:

6. A judgment of acquittal should be entered as to Count Two because there was no evidence before the Grand Jury that the ammunition crossed state lines, thus depriving the Court of subject matter jurisdiction;

7. Alternatively, a judgment of acquittal should be entered as to Count Two because of an absence of evidence before the petit jury that the ammunition crossed state lines.

By way of format, a brief review of the trial evidence will be presented, to be followed by a discussion of each of the seven grounds urged in support of the relief requested. For the reasons hereinafter stated, defendant's motion for entry of a judgment of acquittal is granted as to Count Two. His motion for a new trial as to Count One is denied.

## EVIDENCE AT TRIAL

As a prelude to discussing defendant's arguments on the merits, a brief review of the trial evidence is in order. There is no dispute that on August 21, 1989, in Brooklyn, New York, an automobile that defendant was driving was pulled over by two police officers in a marked police vehicle. As the officers approached the vehicle on foot, defendant suddenly drove away. A pursuit ensued, involving defendant's vehicle and two police cars. It is also undisputed that this phase of the pursuit ended in front of 407 Bristol Street, Brooklyn, at which point defendant alighted from his vehicle and ran down an alley into a courtyard. A number of officers gave chase. After a brief struggle, he was arrested at that location.

The officers testified that defendant discarded a gun during the foot pursuit. That, unlike the foregoing facts, was vehemently disputed by the defense for it is—and was throughout the trial, beginning with Mr. Schoer's opening statement (Tr. 273, 11. 6–16)—Mr. Chin's contention that the recovered firearm was planted by the officers. In an effort to rebut that claim, the government produced evidence which indicated that he possessed the *same* gun nearly two years earlier. That evidence consisted of Veronica Jennings testifying to a confrontation she had with defendant (her then brother-in-law)

---

3. The arguments contained in the Reply Memorandum—submitted by defendant's then counsel—although helpful, did not alter the Court's perception of the issues, as framed by the earlier submissions of the parties, nor the resolution of those issues.

in the lobby of her apartment building at 199 Tapscott Street, in Brooklyn, on November 23, 1987. On that occasion, she encountered defendant as she was descending the stairs from her apartment. She saw him raise his arm, whereupon she turned away and ran upstairs. As she did so, she heard a series of "pop" or "pow" sounds, which she believed were gunshots. She then discovered a hole in a door on the second floor which was not present before those sounds were heard.[4]

Detective Robert Sielaw testified for the government that on November 23, 1987, he found shell casings and spent bullets in the lobby at 199 Tapscott Street upon responding to a reported shooting at that location. Those items were examined by ballistics expert Detective Charles Hopkins who explained to the jury that they were fired from the firearm that was recovered at the site of defendant's arrest on August 21, 1989.

## DISCUSSION

1. *Alleged Perjurious Nature of Government's Proof*

■ Three of the four police officers involved in the chase of defendant testified at trial for the government, those officers being Bill, Hare and Kalt.[5] Yet, although the credibility of all three officers has been called into question by the defense, specific instances of inconsistent testimony have been provided by Mr. Schoer solely with respect to Officer Kalt. As to that officer, numerous inconsistencies are underscored, coupled with counsel's conclusion that those inconsistencies establish that the witness gave perjured testimony at trial, as distinct from being attributable to lapses in memory, confusion, or other non-perjurious shortcomings of the witness.

The inconsistencies pertain to such matters as the streets that were traveled, and in what sequence, during the course of the ve-

hicular chase, and whether the defendant, upon alighting from his vehicle at the end of that stage of the pursuit, went behind or in front of his vehicle as he attempted to flee the scene.

Significantly, the gravamen of the inconsistencies does not pertain directly to the actual recovery of the weapon, which was a central issue in the case. For example, it is *not* alleged that Officer Kalt previously testified that he observed the weapon being recovered from defendant's person, contrary to his trial testimony that he observed it for the first time in the possession of Officer Hare immediately after the arrest at 407 Bristol Street. (*See* Tr. at 484, 11. 12–22.) Most of the inconsistencies pertained to peripheral matters.

Moreover, this is not a case in which evidence of inconsistent statements first surfaced post-trial. To the contrary, the veracity of the officers was aggressively attacked by the defense during the trial, in large measure by utilizing their prior testimony. The inconsistencies cited now were cited then. The jury rejected the concomitant argument that the government's proof was unworthy of belief. The Court is not prepared to find their decision flawed, nor to conclude that the testimony of Kalt, Bill or Hare was perjurious.

It is the Court's finding the jury's verdict as to Count One was fairly derived from the evidence presented. Under such circumstances, it would be inappropriate to set aside the verdict, even if, *arguendo,* the Court disagreed with the conclusion reached. *See United States v. Sanchez,* 969 F.2d 1409, 1413–14 (2d Cir.1992). Parenthetically, it should be noted that the record is devoid of evidence to suggest that Detective Sielaw (who recovered the shell casings and bullets in November of 1987) and Detective Hopkins

---

4. As a result of the Court's ruling pursuant to Federal Rule of Evidence 403, the government was not permitted to elicit testimony consistent with its full proffer concerning the November 23, 1987 incident. As a result, the jury never heard that defendant supposedly said to Ms. Jennings "you're dead" before she heard the "pop" or "pow" sounds, and that a bullet passed through her leg as she fled up the stairs. Yet, there was clearly sufficient circumstantial evidence for the

jury to find that defendant discharged a firearm in the lobby of her apartment building on November 23, 1987.

5. Police Officer Killigrew did not testify for the government and was a proposed defense witness, a subject which will be discussed later in the opinion.

(who linked those items with the subject weapon in this case) were somehow part of the purported scheme to "frame" defendant.

For the reasons above stated, the relief requested by defendant, based on the alleged perjured testimony presented by the prosecution, is denied.

### 2. *Sufficiency of Evidence as to Count Two*

■ Defendant maintains that the evidence before the petit jury was insufficient to support its verdict of guilty to the charge that defendant was a felon in possession of ammunition. The claimed deficiency in proof pertains to the interstate commerce element of the 18 U.S.C. Section 922(g) charge. In the government's view, that element—construing the evidence most favorably to the non-movant as required under Rule 29(c)—was clearly established through the testimony of Special Agent Anthony Annunziato.

To place the present dispute in context, reference to the trial record is in order. All of the relevant testimony on point was elicited during the government's direct examination of Special Agent Annunziato, and is as follows:

#### (Tr. at 885)

Q. Now, sir, with respect to ammunition, do you know where ammunition is manufactured, some of the areas?
A. Yes.

#### (Tr. at 886)

Q. What are some of the locations?
A. Some of the areas are Minnesota, Illinois, some of the main manufacturers.
Q. Is any ammunition manufactured in New York?
A. Some ammunition is manufactured, but it would just be no name manufacturers, like different individuals who manufacture ammunition for their own use, no companies really manufacture ammunition in New York.
Q. What would be a main company?
A. Winchester, Federal.
Q. Now, sir, I show you Government Exhibit eight which contains various bullets.

Can you please take them out and indicate who the manufacturer was and whether these bullets were manufactured in New York State?
A. Winchester.
Q. Hold them up, sir, so we can say see what you're doing.
A. Winchester ammunition. Winchester ammunition. Winchester .45 caliber ammunition. Western ammunition.
Q. Where is Western manufactured?
A. Outside of New York State.
Q. What about Winchester?
A. Outside of New York State. Western, Winchester, Western, Federal.

#### (Tr. at 887)

Q. Where is Federal manufactured?
A. Outside of New York State, and PMC.
Q. Where is PMC manufactured?
A. Also out of New York State.
Q. Sir, please place those back in the envelope or I should say the plastic bag.
Please take a look at Government Exhibit nine. Empty its contents.
Is there a plastic bag in there?
A. Yes.
Q. Let's look at the plastic bag first, sir. Don't remove what's in there. Can you hold it up for us. Can you tell whether the shell casings in there, where those two were manufactured?
A. I believe Federal Ammunition is manufactured outside of New York State.
Q. Was that for both?
A. Yes.
Q. What about the remaining shell casings, sir, in that envelope?
A. Federal, and I believe Federal.

Is the above testimony, viewed most favorably to the prosecution, sufficient to permit a reasonable person to conclude beyond a reasonable doubt that the subject ammunition was involved in interstate commerce? *See, e.g., United States v. Artuso,* 618 F.2d 192, 195 (2d Cir.), *cert. denied,* 449 U.S. 879, 101 S.Ct. 226, 66 L.Ed.2d 102 (1980) (indicating standard to be applied in deciding a Rule 29(c) judgment of acquittal motion).

As part of its proof, the government must establish a nexus between the ammunition and interstate commerce. *See United States v. Carter,* 981 F.2d 645 (2d Cir.1992), *cert. denied,* 507 U.S. 1023, 113 S.Ct. 1827, 123 L.Ed.2d 456 (1993). Evidence that ammunition was manufactured outside of New York State, and that defendant was found in possession of that ammunition within the State, compels the conclusion that the ammunition crossed state lines at some point. *See United States v. Sanders,* 35 F.3d 61 (2d Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 497, 130 L.Ed.2d 407 (1994). However, the evidence of out-of-state manufacture must predate defendant's arrest. *See id.*

*United States v. Jones,* 16 F.3d 487 (2d Cir.1994) is instructive on this point. Jones was charged, *inter alia,* with being a felon in possession of a firearm in violation of Section 922(g). *See id.* at 489. At trial, a special agent of the FBI testified "that no hand guns *'are* manufactured' in New York State." *Id.* at 490 (emphasis added). Relying on that testimony, the District Court denied the defendant's Rule 29(a) motion to dismiss the firearm charge, concluding that the jury could infer that the weapon was manufactured elsewhere. *Id.*

Jones's conviction as to the count under discussion was reversed for the government's failure to establish that the firearm had, at some point *prior* to defendant's arrest, been involved in interstate commerce. *Id.* at 492. As explained by Judge McLaughlin in writing for the Second Circuit, simply eliciting testimony that the model of firearm involved is not presently manufactured in the State of New York does not suffice to create factual issues for the jury's determination.[6] *Id.* at 491–92.

Special Agent Annunziato's testimony, viewed in conjunction with the rationale espoused in *Jones,* indicates the inadequacy of the government's proof concerning the inter-

state commerce element of Count Two. Granted, the prosecutor's initial question concerning the bullets, as well as his question concerning the shells, asked whether the bullets and shell casings "were manufactured" in New York State, apparently intending to focus the witness's attention on the period prior to defendant's arrest. (*See* Tr. at 886, 11. 11–15; Tr. at 887, 11. 11–14.) Unfortunately, the first question asked about the bullets, which are the subject of Count Two, was compound (*See* Tr. at 886, 11. 11–15), and elicited merely the name of a manufacturer. The multiple answers provided in serial fashion thereafter regarding the shells and casings were stated *solely* in the present tense, as are all but one (*See* Tr. at 887, 1. 17) of the intervening questions asked by the government.

The Court recognizes that, although questions are never evidence, the substance of a question must be considered to place the answer in context. Nonetheless, it is axiomatic that to the extent there is a divergence between the question asked and the answer given, the answer alone—if not stricken as "unresponsive"—has evidentiary significance. Agent Annunziato told us that as of January 19, 1995, that being the date he testified, the subject bullets and casings were not being manufactured within the State of New York. He was never asked whether one or more of the items was *ever* manufactured in the State of New York, or some other type of question, the answer to which might have established that the ammunition was manufactured in a foreign jurisdiction and, therefore, had crossed state lines sometime prior to being recovered here on August 21, 1989. Perhaps, that was the impression Annunziato intended to convey, but that was not what he said, implicitly or otherwise. Each of his answers was in the present tense, and spoke of where such ammunition was manufactured at the time of trial, not five years before.

---

**6.** In *Jones,* Judge McLaughlin mentioned that Appellant demonstrated on appeal that such guns were at one time manufactured in New York State. *Jones,* 16 F.3d at 491. Moreover, the Court noted that there were at least two reported cases involving prosecutions under 18 U.S.C. Section 922(g) in which that fact was established. *Id.* These observations, however, do not

render the holding in *Jones* inapplicable to the case at bar. The appropriate reference point for present purposes *must* be the evidence that was before the jury, not additional arguments and extrinsic facts advanced during the course of the appeal to underscore the obvious inadequacy of proof at trial.

It may be the witness intentionally answered as he did, with full knowledge of the purpose underlying the line of inquiry, believing that his answers were helpful on the ground that "if ... [ammunition is] ... not now manufactured in New York, any ... [ammunition] now possessed in New York must have been manufactured outside of New York," or so a jury could legitimately infer. From *Jones,* however, we know that rationale is unsound. Such testimony does not create an issue of fact for the jury's consideration. *Jones,* 16 F.3d at 491.

To partially reiterate in concluding this point, the issue is relatively straight forward. Was there information in the record which would permit a reasonable trier of fact to conclude beyond a reasonable doubt that the ammunition recovered on August 21, 1989, crossed state lines? Simply indicating that the manufacturers of the bullets and shell casings involved presently conduct their operations outside of New York is not sufficient. Perhaps such items were at one time manufactured within the State of New York, perhaps not. As to that issue, and Agent Annunziato's possible knowledge in that regard, the record is silent.

In *Jones,* the conviction was set aside because the "only evidence regarding interstate commerce was Agent Moore's testimony that hand guns are not presently manufactured in New York State." *Id.* The evidence here is similarly limited, and the resulting conviction similarly flawed. Accordingly, defendant's motion for a judgment of acquittal as to Count Two, made pursuant to Rule 29(c), is granted.[7]

3. *Defendant's Constitutional Rights Were not Compromised by the Court Disallowing Intended Defense Witness Killigrew From Invoking his Fifth Amendment Privilege in Front of the Jury*

█ Certain references to the record are a necessary prelude to a discussion of this topic. Firstly, it should be noted that Officer Killigrew was one of the four officers involved in the arrest on August 21, 1989. As mentioned previously, the other three testified for the prosecution. Mr. Schoer advised the Court that he intended to call Officer Killigrew as a defense witness. It developed that if the officer was called, he would invoke the Fifth Amendment as to certain matters then under investigation. However, it was reported that he would *not* invoke his privilege against self incrimination concerning the events of August 21, 1989. (*See* Tr. at 1058, ll. 11–16.)

Counsel and the Court discussed the legal issues involved at great length. During the course of that dialogue, the Court, *inter alia,* indicated:

1. That Mr. Schoer could call the officer to the stand out of the presence of the jury. (Tr. at 1124, ll. 5–7.) Should he invoke the privilege solely in response to certain questions pertaining to his *general* credibility under Rule 608(b) of the Federal Rules of Evidence, then counsel would be precluded from re-asking those questions before the jury, given his knowledge that the witness would invoke the Fifth Amendment. (Tr. at 1133, ll. 6–21; Tr. at 1137, ll. 13–20.)

2. However, it was explained that if the witness had a change of heart, and endeavored to invoke the Fifth Amendment concerning any aspect of the events that transpired on August 21, 1989—*including the planting of a gun in this case, or in any other case*—then the Court would pursue the matter further. Indeed, it was even discussed that if such a scenario developed, perhaps the government should be presented with the Hobson's choice of either asking that Officer Killigrew be immunized, or face the prospect of the having the accusatory instrument dismissed. (Tr. at 1116, ll. 9–21.)

3. Throughout the discussions, the Court repeated that Mr. Schoer obviously had a right to call Officer Killigrew as a defense witness, and inquire fully about the events of

---

**7.** The alternate ground advanced by defendant for a vacatur of the conviction under Count Two need not be considered in view of the fact that the relief requested has been granted pursuant to Rule 29(c). That alternate ground raised the question of whether the failure to present *any* evidence to the Grand Jury that the ammunition crossed state lines deprived the Court of subject matter jurisdiction.

August 21, 1989. (Tr. at 1133, 11. 10–12; Tr. at 1138, 11. 9–15.) The only limitation imposed was asking general credibility questions which he knew beforehand would prompt a refusal to answer on the grounds of self incrimination.

In any event, defendant declined the Court's offer to, *inter alia*, examine the witness outside the presence of the jury. That process may have served to provide clearer parameters of the problem confronting counsel and the Court, *viz.* the precise questions, or lines of collateral inquiry, which would trigger assertion of the privilege.

To the defense, the issue was simple, calling for either a "yes" or "no" answer, independent of context. The position taken is well synopsized in the following excerpt from the trial transcript:

> The Court: So your position is if there's any information that would be relevant under 608(b) where we anticipate the witness is going to invoke the Fifth Amendment, that the invocation should be before the jury.
>
> Mr. Schoer: Yes.

(Tr. at 1127, 11. 8–12.)

It was the Court's view then, as it is now, that requiring a witness to invoke the Fifth Amendment before a jury on collateral credibility issues serves no legitimate purpose. The jury is not permitted to draw an inference from the witness's assertion of the right. *See United States v. Deutsch,* 987 F.2d 878, 883–84 (2d Cir.1993). Accordingly, the question asked seeks information which is irrelevant under Rule 401 of the Federal Rules of Evidence.

It appears that the only reason that the defense intended to place Officer Killigrew on the stand was to have him refuse to answer questions involving collateral matters. Indeed, defense counsel never suggested at trial the manner in which Officer Killigrew's testimony might aid the defendant, or

otherwise shed light on the issues in controversy.[8]

In sum, defendant was not denied "his due process right to a fair trial and his right of confrontation," (*see* Def.Mot. at 13), by the Court's ruling regarding Officer Killigrew.

4. *Defendant was not Denied a Fair Trial by Failure of the New York City Police Department to Timely Respond to His Subpoena*

■ Prior to trial, defendant served a court ordered subpoena on the New York City Police Department seeking personnel records of the officers involved in the subject arrest. On January 19, 1995, defense counsel advised the Court that he had anticipated that the police department would comply with the subpoena, but had just received a telephone call from someone in their legal department indicating that they intended to move to quash the subpoena even though its original return date was January 3rd.

After reporting the above to the Court, defense counsel stated:

> I honestly don't know how to handle this situation, Judge. I don't know what Your Honor can do at this point, but I think that at the close of the trial at the very least, that I think that I ought to make some sort of application to Your Honor and something ought to be done about this, not only for this defendant but for other defendants.

(Tr. at 914, 1. 25–915, 1. 6.)

The Court responded "I'm amenable to any reasonable suggestions and I fully understand what you are saying and I appreciate your concern." (Tr. at 915, 11. 13–15.)

Mr. Schoer had ample opportunity to take action between the return date of the subpoena, *i.e.* January 3rd, and the date the problem was brought to the Court's attention on January 19th. Moreover, on any date during that time frame, including on January 19th, he could have asked the Court to assist

---

8. Similarly absent from defendant's post-trial submissions is specificity as to the evidence that defense counsel sought to elicit from the witness. However, *if* the subject contemplated pertained to the possibility of the witness asserting his privilege against self incrimination when asked

about planting a gun in this, or in any other case, the Court—as stated to counsel at that time—was prepared to entertain any reasonable suggestion to prevent unfair prejudice to the defendant should that scenario arise. *See supra* at 16, ¶ 2.

him in having the personnel records produced. Of course, it may be that there was nothing in those records that would have proven to be of assistance to the defense. No specific proffer was made in that regard.

Granted, the procedure followed by the New York City Police Department left much to be desired, but that is not a ground, given the totality of the circumstances, to vacate the jury's verdict of guilty as to Count One.

5. *Defendant not Entitled to a New Trial Based on Claimed Prosecutorial Misconduct or Ineffective Assistance of Counsel*

A. *Prosecutorial Misconduct*

■ Defendant, *pro se*, has cited numerous incidents which he has categorized as prosecutorial misconduct. Initially, it should be noted that to obtain a new trial on that ground, a defendant must make a showing of substantial prejudice. To determine if that standard has been satisfied, the Second Circuit has explained that three factors should be considered: (1) the severity of the misconduct (2) the measures adopted by the Court to cure the misconduct, and (3) the certainty of conviction absent the improper conduct. *United States v. Biasucci*, 786 F.2d 504, 514 (2d Cir.), *cert. denied*, 479 U.S. 827, 107 S.Ct. 107, 93 L.Ed.2d 56 (1986).

■ The spectrum of impropriety charged by defendant is broad. It includes a claim that the prosecutor's statement during his opening that "Mr. Chin bolts and blows the light ...," might have caused the jury to believe that the prosecutor had personal information, outside the record, that Chin had fired shots at the traffic control device. (*See* Def's. *Pro Se* Feb. 26, 1995 Mot./Mem.Supp. at 7.) Given the extensive, and largely undisputed testimony concerning the

car chase, including the defendant driving his vehicle through a red light, defendant's fears are fanciful, and his argument spurious.

■ Another complaint of defendant focuses on evidence adduced from Veronica Jennings and Detective Sielaw (as well as questions asked of Ricardo Goodridge)[9] regarding the November 23, 1987 incident at 199 Tapscott Street. Defendant argues that since no witness testified to having *seen* a gun in his hand on November 23, 1987, the prosecutor's arguments during summation that defendant possessed and fired the weapon on that date represents solely the prosecutor's "personal observations about the guilt of the accused not supported by an iota of testimony before the jury." *Id.* This argument, again, is flawed for, *inter alia*, it ignores the role that circumstantial evidence often plays in resolving factual disputes.

Indeed, the sole purpose of that testimony being placed before the jury was to provide the government with an opportunity to rebut defendant's claim that the weapon recovered on August 21, 1989 was not his, but rather was planted on him. The prosecutor's closing comments were appropriate. The evidence before the jury certainly supported the conclusion that defendant possessed and fired a firearm on November 23, 1987.

■ Similarly unavailing is defendant's attack on the prosecutor's closing arguments regarding the reliable character of the government's proof. Those comments were in response to the common theme which ran throughout the defendant's opening, cross examination of government witnesses, direct examination of his witnesses, and his closing argument, *viz.* that the entire case against him was predicated on perjured testimony. Under such circumstances, a prosecutor's ar-

---

9. Defense witness Ricardo Goodridge testified on direct examination in support of the proposition that the subject weapon was planted on defendant. Accordingly, the government argued: "this witness stated on direct that this gun was planted. If I can show that Mr. Chin stated that he fired the gun two years later [sic] [presumably should read "earlier"] it now rebuts the claim he's making". (Tr. at 1233, ll. 17–21.) Based on that proffer, the government was permitted to pursue this line of inquiry on its cross examination.

However, the last of the questions asked, at least if viewed apart the preceding question and answers, was overly broad. The question was as follows: "Did Mr. Chin ever tell you that he fired a gun in the presence of his wife?" Tr. at 1234, ll. 9–10. However, the defendant was not prejudiced thereby, given (a) the three related questions asked of Goodridge were each answered in the negative and (b) the general subject matter embodied in the questions was already properly before the jury via the testimony of Veronica Jennings.

guments geared to countervail that theme are not improper. Of course, there are limits as to what may be said under the guise of "fair comment," but those limits were not violated in this case.

■ Another ground urged by defendant in seeking a new trial rests on the fact that the prosecutor used such phases as "I submit" during his summation. This, it is claimed, constituted impermissible "vouching" for the credibility of the witness or witnesses whose testimony was the subject of the prosecutor's comment.

The issue, regarding at what point the use of such phrases as "I submit" reaches the level of impermissible "vouching," is explained *United States v. Nersesian,* 824 F.2d 1294, 1328 (2d Cir.), *cert. denied,* 484 U.S. 958, 108 S.Ct. 357, 98 L.Ed.2d 382 (1987). A juxtapositioning of that explanation with the transcripts of the prosecutor's initial and rebuttal summations, indicates the invalidity of defendant's position, notwithstanding the occasional use of the pronoun "I," and such phrases as "we know" and "I submit." Parenthetically, no contemporaneous objection was voiced by the defense. The Court did not issue a curative instruction, *sua sponte,* given the infrequency of the now challenged language and the fact that its use did not impress the Court as conveying the prosecutor's personal belief regarding the evidence.

In sum, the defendant's multifaceted argument regarding prosecutional misconduct is meritless. Accordingly, the last two prongs of the *Biasucci* test will not be discussed.

## B. *Ineffective Assistance of Counsel*

### (i) Prison Garb

■ Mr. Chin's most specific, and facially significant claim of "ineffective assistance of counsel," is that:

Counsel failed to argue and protect defendant's right, not be tried in identifiable prison garb, and also failed to seek curative measure on this matter.

(Def.'s Feb. 26, 1995 Mot./Mem.Supp. at 20.)

The factual support for that claim is limited to the following excerpt from Mr. Chin's affidavit in support of his motion:

A week or two before trial, counsel became aware that defendant was seeking civilian clothes so as not to proceed to trial in identifiable prison garb. Defendant encountered some problems and could not receive his clothes. Counsel thereafter, failed to advise the defendant of his right not to proceed to trial in identifiable prison garb, and also failed to request from the Court a curative instruction in relationship to the identifiable prison garb.

(Chin Feb. 27, 1995 Affid. ¶ 7.)

The Court recalls that defendant did appear for trial in a solid blue shirt which constituted prison garb. Presumably, some or all of his other items of clothing were of like issue. This situation should have prompted the Court to inquire about his attire, *sua sponte,* if no one else broached the subject. However, the issue was not raised by anyone, including—through inadvertence—the Court. Nonetheless, that error—given the totality of the circumstances involved—does not warrant a new trial.

Noticeably absent from Mr. Chin's submission is an allegation that *he* was not aware of his right to be tried in non-prison clothes. If he knew of, and was fully capable of asserting that right, counsel's failure to so advise him is not of constitutional significance.

Generally, of course, a defendant's knowledge of such matters is derived from counsel. But Mr. Chin is not a typical defendant. His knowledge of the basic legal rights of an accused is extensive, as evidenced by a perusal of his repeated *pro se* submissions to the Court, both before and after trial. With respect to this particular right, Mr. Chin has explained that he endeavored to obtain "civilian clothes" for the trial, apparently free of any input from counsel. Counsel, we are told, "became aware" of his efforts a week or two before trial. Under the circumstances, it would appear that Mr. Chin was aware of the right which he independently endeavored to exercise, *viz.* the right to be tried in civilian clothes. Mr. Chin's *pro se* submission is atypically cryptic in this regard.

Of course, some defendants may be aware of a right, but understandably hesitant to assert it in a courtroom setting. Such reluc-

tance is not a trait of Mr. Chin. During pretrial hearings, and the trial itself, he personally—rather than through counsel—asked the court, *inter alia*, to have the courtroom doors closed, to lower my voice at sidebar to prevent jurors from overhearing what was being said, and to please "try to understand ... [him] because the stenographer misquoted ... [him] in the past." (Tr. at 80, 11. 21–23.) More significantly for present purposes, the defendant had the presence of mind to immediately alert Mr. Schoer when he believed that one of the jurors may have seen him in handcuffs with a Marshall during a recess in the proceedings. (Tr. at 190, 11. 15–22.) That act is indicative of his awareness of the right to be tried by a jury ignorant of his prisoner status.

To partially reiterate, Mr. Chin stands apart from most defendants based on his extensive knowledge of the rights afforded to those accused of a crime, and his proclivity to state his views directly to the Court—both orally and in writing—whether represented by counsel or without counsel. Moreover, he had no reason to believe that this Court would not listen to him if he voiced any concern about his attire. The record in this case—before, during and after trial—demonstrates that every reasonable request of Mr. Chin has been granted in whole or in part.

The surrounding circumstances essentially compel the conclusion that Mr. Chin knew, independent of counsel, of his right not to be tried in prison garb. Indeed, he has not stated, or even suggested that he was not aware of this right. The information and arguments advanced by Mr. Chin regarding this facet of his ineffective assistance of claim are primarily noteworthy for what is not said.

What "problems" did he encounter in receiving his clothes? Did he discuss those problems with counsel? If not, why not? Why did he not directly advise the Court of the situation, as he had done with other problems and issues in the past? This type of information is absent from Mr. Chin's application.

What he does say is sketchy. For example, no specificity is given as to the item or items of prison garb worn—was he completely so attired, or was his shirt the only item? No effort was made in his submission to suggest the basis for believing that the jury would know that his clothes constituted prison garb, *i.e.* were identifiable as such by laypersons.

Of course, Mr. Chin has elected to proceed *pro se* as to this portion of his post-trial motion. His submission, therefore, may not be held to the same standard applicable to an attorney's work product. Under such circumstances, the Court normally would direct that a hearing be held to determine the legitimacy of Mr. Chin's "prison garb" claim. Here, however, *no such hearing is required.*

Even if, *arguendo,* Mr. Chin was not advised, nor did he otherwise know of his right not to be tried in identifiable prison garb, and if, in fact, the jury knew that he was wearing one or more such items, the resulting error would be "harmless beyond a reasonable doubt," given the overwhelming nature of the government's proof as to Count One. *See United States v. Hurtado,* 47 F.3d 577, 581 (2d Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 266, 133 L.Ed.2d 188 (1995). The ballistics testimony provided a compelling basis for the jury to conclude that the weapon recovered on August 21, 1989 was not planted on Mr. Chin, but rather belonged to him as evidenced by his use of the same weapon two years earlier in the 199 Tapscott Street incident. There is no reasonable basis to believe that Mr. Chin might have been acquitted on Count One, as well as on Counts Three and Four, had his attire been different. For that reason, the charged error of trial counsel—in allegedly not advising him of his right to be tried in non-prison garb, and in not seeking a curative instruction from the Court—is not a ground to set aside the jury's verdict as to Count One.

#### (ii) Other Claims of Ineffective Assistance of Counsel

As to Mr. Chin's remaining claims of ineffective assistance of counsel, his assault is largely couched in conclusory terms. By way of example, it is asserted that defense counsel "failed to object to improper jury charge," absent an indication as to the por-

tion or portions of the charge believed to be erroneous. The amorphous nature of these claims precludes a meaningful discussion of their substance. However, the following two observations may be made:

1. The legitimacy of Mr. Chin's assertion that trial counsel's allegiance was with the government, not him, is at the very least called into question by the defendant's acquittal on two counts, and the post-trial dismissal of another based on the inadequacy of the proof adduced by the government at trial.

2. With respect to Count Two, had Mr. Schoer been in the prosecution's camp, presumably he would have endeavored to cure the deficiency in Special Agent Annunziato's testimony during his cross examination (which was uncharacteristically brief), rather than broaching the subject after the trial record was closed.

As to these remaining claims of ineffective assistance of counsel, Mr. Schoer's representation was vigorous, and consistent with his professional responsibilities as defense counsel for Mr. Chin. Defendant's application is devoid of information indicating that the assistance provided regarding these matters fell below the objective standard of reasonableness enunciated in *Strickland v. Washington,* 466 U.S. 668, 687–88, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). Also significantly absent is a proffered nexus between the claimed deficiencies in counsel's performance and the outcome of the proceeding. *Id.* at 694, 104 S.Ct. at 2068. In that regard, the government's proof as to Count One—as explained previously—was compelling.

(iii) Conclusion re "Ineffective Assistance of Counsel" Claim

Defendant has failed to substantiate his claim that the interests of justice mandate a new trial, based on the alleged ineffective assistance of counsel.

10. To the extent an argument advanced by defendant has not been specifically mentioned, it has

*CONCLUSION*

For the reasons stated above, defendant's application for a judgment of acquittal as to Count Two is granted; in all other respects the relief requested is denied.[10]

SO ORDERED.

been considered and found to be without merit.